**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

Fargo Stopping Center LLC, and
Bjornson Oil Company, Inc., individually and
on behalf of a class of all others similarly
situated,

               Plaintiffs,

v.

PepsiCo, Inc., and Walmart Inc.,

               Defendants.

</td><td>

**Case No.: 26-cv-1283**


**CLASS ACTION COMPLAINT**
**(JURY TRIAL DEMANDED)**

</td></tr>
</table>

Plaintiffs Fargo Stopping Center LLC, and Bjornson Oil Company, Inc. ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action pursuant to Federal Rule of Civil Procedure 23 against PepsiCo, Inc. ("Pepsi"), and Walmart Inc. ("Walmart"), (collectively, "Defendants") for violating federal antitrust laws. Plaintiffs' claim stems from agreements between Pepsi, the second-largest beverage and processed food company in the world, and Walmart, one of the largest retailers in the world, to inflate prices for Pepsi soft drinks above competitive levels.

## I.        NATURE OF THE CASE

1.        Pepsi is among the largest soft drink companies in the world. Its portfolio of soft drinks includes widely recognized brands such as Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks (collectively, "Pepsi Soft Drinks").

2.        Walmart is Pepsi's most significant customer. In its 2024 Annual Report, Pepsi disclosed that sales to Walmart and its corporate affiliates accounted for 14 percent of Pepsi's consolidated net revenue, or approximately $12.86 billion. Pepsi further advised investors that the

loss of Walmart as a customer "would have a material adverse effect" on its business. Walmart was the only customer identified in the 2024 Annual Report as posing such a risk.

3.      Beginning at least as early as 2018, Pepsi and Walmart entered into a scheme (the "Scheme") designed to suppress wholesale and retail competition for Pepsi Soft Drinks, thereby allowing both companies to charge supracompetitive prices.

4.      The Scheme has two principal components. First, Pepsi agreed to raise its wholesale prices for Pepsi Soft Drinks above competitive levels for wholesale customers other than Walmart ("Wholesale Customers"). Wholesale Customers purchase Pepsi Soft Drinks directly from Pepsi and compete with Walmart at the retail level. The inflated wholesale prices enabled Walmart to increase its retail prices above competitive levels and forced Wholesale Customers to raise their own retail prices.

5.      Second, Pepsi required Wholesale Customers to maintain retail prices for Pepsi Soft Drinks that were higher than Walmart's retail prices—even when Walmart's retail prices substantially exceeded the wholesale prices that Pepsi set for Wholesale Customers. To enforce this aspect of the Scheme, Pepsi monitored and policed Wholesale Customers' retail pricing and penalized Wholesale Customers who undercut Walmart by imposing additional wholesale price increases.

6.      In return for Pepsi's actions to raise retail prices, Walmart agreed to accept Pepsi's elevated wholesale prices. This agreement allowed Pepsi to impose numerous wholesale price increases on Pepsi Soft Drinks on both Walmart and Wholesale Customers. These increases cannot be explained by market forces such as changes in supply, demand, or costs.

7.      The Scheme reduced competition at the wholesale level and disadvantaged Pepsi's Wholesale Customers who directly purchased from Pepsi, including grocery stores, local convenience stores, mid-tier grocers, and independent retailers. As a result, these Wholesale

Customers, including Plaintiffs, were forced to pay inflated prices for Pepsi Soft Drinks.

8.     The Scheme benefited both Pepsi and Walmart. Pepsi obtained supracompetitive profits from its sales of Pepsi Soft Drinks to Wholesale Customers, while Walmart was able to sell Pepsi Soft Drinks at inflated retail prices without facing price competition from other retailers.

9.     The Scheme was facilitated by Pepsi's power in the soft drink market and its oligopolistic relationship with The Coca-Cola Company ("Coca-Cola") and Keurig Dr Pepper Inc. ("Dr. Pepper"). Together, these three firms account for more than 90 percent of carbonated soft drink sales in the United States. In such an oligopolistic market, price increases by one dominant firm—here, Pepsi—are often followed by comparable increases by other dominant firms, particularly when a dominant retailer such as Walmart limits price competition.

10.     As a result, the Scheme reduced inter-brand competition at the wholesale level by preventing Walmart from lowering retail prices and demanding lower wholesale prices, and by dampening competition between Pepsi and its primary rivals. This increased Pepsi's market power and further raised the prices it charged its direct purchasers, including Plaintiffs.

11.     The Scheme has also garnered the attention of U.S. Congress and prompted multiple inquiries into Pepsi's pricing tactics. Most recently, in a January 28, 2026 letter to Pepsi, Members of Congress wrote, "[A] newly unsealed Federal Trade Commission (FTC) complaint . . . raises fresh questions about whether PepsiCo (Pepsi) is engaging in discriminatory pricing strategies in favor of large chain stores that force smaller, independent retailers – and American consumers that shop at these retailers – to pay higher prices.[1] The congressmen further found that "[t]his newly disclosed information reveals new details about Pepsi's troubling pricing practices,

---

[1] Letter from Senator Warren et al. to Pepsi CEO Ramon Laguarta 1 (Jan. 28, 2026), https://www.warren.senate.gov/imo/media/doc/20260128pepsifollowupletter.pdf.

and also appears to indicate that Pepsi's responses to our previous inquiry into this matter were evasive and inaccurate."[2]

12.    Likewise, Congress has taken issue with the FTC's handling of Pepsi and the Scheme. In tandem with its January 28, 2026 letter to Pepsi, Congress sent a letter to the FTC stating, "Based on our review of recently unredacted materials, we are concerned that the Federal Trade Commission (FTC) lacked substantive grounds for dismissing its *Robinson-Patman Act* (RPA) lawsuit against PepsiCo (Pepsi)." The letter continued, "We are seeking answers regarding whether the FTC's decision to dismiss the lawsuit was politically motivated, and we urge the FTC to reconsider its decision to abandon the lawsuit."[3]

13.    Walmart has engaged in similar conduct before. At approximately the same time that Walmart required Pepsi to agree to protect it from retail competition by raising rivals' wholesale prices for Pepsi Soft Drinks, Walmart obtained a nearly identical agreement from Energizer Holdings, Inc. ("Energizer") in the highly concentrated disposable battery market.[4] There, as here, Energizer agreed to raise wholesale prices for customers that sold below Walmart's retail prices.

14.    In both instances, the defendants' conduct was economically irrational absent an agreement. As the district court observed when denying Walmart's and Energizer's motion to

---

[2] *Id. See generally* Letter from Senator Warren et al. to Pepsi CEO Ramon Laguarta (May 11, 2025), https://www.warren.senate.gov/imo/media/doc/letter_from_senators_warren_booker_repnadlertopepsirerobinsonpatmanact.pdf; Letter from Pepsi to Senator Warren et al. (May 25, 2025), https://www.warren.senate.gov/imo/media/doc/response_to_letter_to_pepsi_re_robinson-patman_act.pdf.

[3] Letter from Senator Warren et al. to FTC Chairman Andrew N. Ferguson 1 (Jan. 28, 2026), https://www.warren.senate.gov/imo/media/doc/letter_to_ftc_re_pepsi_rpa_lawsuit.pdf.

[4] *See* Compl., *Copeland v. Energizer Holdings, Inc.*, No. 5:23-cv-02087, ECF No. 1 (N.D. Cal., Apr. 28, 2023). The *Copeland* court is considering that case in tandem with two others: *Portable Power, Inc. v. Energizer Holdings, Inc.*, No. 5:23-cv-02091 (N.D. Cal., filed Apr. 28, 2023), and *Schuman v. Energizer Holding, Inc.*, No. 5:23-cv-2093 (N.D. Cal., filed Apr. 28, 2023).

dismiss the direct purchaser complaint challenging that scheme, "[i]f Energizer was independently pursuing its own interests, then for any given wholesale price, Energizer would generally be motivated to minimize the ultimate retail prices—thereby maximizing sales and ultimately its profits."[5]

15.    The same reasoning applies to Pepsi. Pepsi's willingness to sacrifice sales by raising retail prices reflects "that the two businesses had a shared understanding of the mutual benefits their coordinated conduct would create."[6]

16.    The Scheme caused Wholesale Customers who purchase Pepsi Soft Drinks directly from Pepsi, including Plaintiffs, to pay higher prices than they would have paid absent the unlawful conduct.

17.    Plaintiffs bring this action individually and on behalf of a nationwide class of direct purchasers to recover treble damages for the overcharges paid and to enjoin Defendants' unlawful conduct.

## II.    THE PARTIES

18.    Plaintiff Fargo Stopping Center LLC, is a limited liability corporation with its principal place of business in Fargo, North Dakota. Fargo Stopping Center LLC operates a full-service grocery store located in Fargo, North Dakota. Fargo Stopping Center LLC purchased Pepsi Soft Drinks at artificially inflated prices directly from Pepsi during the Class Period defined below. Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

19.    Plaintiff Bjornson Oil Company, Inc., is a North Dakota corporation with its

---

[5] *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 764 (N.D. Cal. 2024).

[6] *Id.*

principal place of business in Cavalier, North Dakota. Bjornson Oil Company, Inc. operates a convenience store located in Cavalier, North Dakota. Bjornson Oil Company, Inc. purchased Pepsi Soft Drinks at artificially inflated prices directly from Pepsi during the Class Period defined below. Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

20.     Defendant Pepsi is an American multinational snack, food, and beverage manufacturer incorporated in North Carolina and headquartered in Purchase, New York. Pepsi conducts its business throughout the United States and across state lines, with dozens of production and distribution locations across the country. Founded in 1898, Pepsi owns or controls multiple iconic beverage and food brands worth over $1 billion, including Pepsi-Cola, Frito Lay, Mountain Dew, Starbucks (under license), Gatorade, and Aquafina. In 2024, Pepsi reported global net revenues of over $91 billion.

21.     Defendant Walmart is the largest company in the world by revenue headquartered and operates thousands of retail stores in the United States. Walmart is incorporated in Delaware and headquartered in Bentonville, Arkansas.

### III.    JURISDICTION AND VENUE

22.     This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). Plaintiffs seek treble damages for their injuries and those suffered by members of the proposed Class resulting from Defendants' anticompetitive conduct. Plaintiffs also seek to enjoin Defendants' anticompetitive conduct and for such other relief that is just, equitable, and afforded under the laws of the United States.

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1337(a) (antitrust), as well as 15 U.S.C. §§ 4, 15, 26 (antitrust). This Court also

has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), as this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from that of each Defendant.

24.    This Court has personal jurisdiction over Defendants because each of them transacted business in this District and engaged in the alleged antitrust conspiracy. Defendants' actions have a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District and throughout the United States.

25.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391. Pepsi is headquartered in this District. Pepsi has also sold Pepsi Soft Drinks to Walmart and members of the proposed Class in this District. Finally, certain unlawful acts by the Defendants were performed in this District as described herein. Those and other unlawful acts caused harm to interstate commerce in this District.

## IV.    FACTUAL BACKGROUND

### A.    The U.S. Soft Drink Market.

26.    The manufacture and sale of bottled soft drinks is a $150 billion industry in the United States. Pepsi is the second largest manufacturer of soft drinks in the United States, after Coca-Cola. PepsiCo is structured into seven divisions, one of which is PepsiCo Beverages North America ("PBNA"). PBNA oversees Pepsi's soft drink operations in the United States and Canada and generated $27.6 billion in revenue in 2023. Pepsi's major brands include Pepsi, Mountain Dew, Starry, Bubly, Aquafina, Lipton, Pure Leaf, Gatorade, Rockstar, and Starbucks. Pepsi supplies retailers through a bottling network that includes both wholly owned bottling subsidiaries

and numerous franchise bottlers. For its wholly owned bottlers, Pepsi directly sets the wholesale prices offered to Wholesale Customers.

27.    Pepsi serves customers across multiple retail channels, including grocery, drug, convenience, discount/dollar, mass merchandise, and membership clubs. Wholesale Customers obtain Pepsi Soft Drinks from Pepsi's bottlers and then resell them to consumers. Wholesale Customers compete both within the same channel and, frequently, across different channels in the sale of Pepsi Soft Drinks.

28.    Pepsi has significant market power in the retail market for bottled soft drinks, controlling nearly a third of all soft drink sales in the United States. Its only notable competitors are Coca-Cola and, to a lesser extent, Dr. Pepper. Together, the three sell over 90 percent of all carbonated soft drinks in the United States.

29.    The bottled soft drink industry is characterized by high barriers to entry, which further increases Pepsi's market power. Perhaps the most visible barrier to entry in the market for bottled soft drinks is advertising. For more than 50 years, Pepsi and its main rival, Coca-Cola, have engaged in the well-documented "Cola Wars" to compete for consumer loyalty through mutually targeted advertising campaigns. Today, Pepsi spends upwards of $3 billion on advertising annually, leading to near-universal brand recognition. Many food and beverage retailers view carrying Pepsi Soft Drinks as critical, and retailers that do not carry Pepsi Soft Drinks can find themselves at a competitive disadvantage compared to those that do.

30.    Another barrier to entry is access to the complex, nationwide manufacturing, bottling, and distribution network that Coca-Cola, Pepsi, and Dr. Pepper leverage to access retailers across the United States. Each soft drink manufacturer uses a combination of wholly owned and independent "bottlers" to manufacture, bottle, and sell their soft drinks to retailers.

These networks have been developed over more than 100 years, since Coca-Cola first pioneered the bottler-distributor model in the late 1800s. Independent bottlers operate in distinct geographic regions and contract with Coca-Cola, Pepsi, and Dr. Pepper to manufacture and bottle their products in exchange for the exclusive right to distribute the company's soft drinks in that region. Pepsi then employs what it calls its "Direct-Store-Delivery" logistics system to facilitate direct delivery from its wholly owned and independent bottlers to retailers across the country.

31.    Without access to these bottler networks, a competitor cannot leverage the vast economies of scale and broad distribution networks that these bottlers have built over more than a century of development and consolidation. And access to bottlers, in turn, requires the multi-billion-dollar annual investments in advertising and brand reputation that Pepsi and its rivals make to ensure ultimate customer demand for the soft drink products their bottlers manufacture and distribute. The pivotal role bottlers play in the distribution chain—and the preexisting scale necessary to access their networks—creates a significant barrier to entry for smaller would-be competitors.

**B.    Walmart's dominance makes it a critical relationship for Pepsi.**

32.    At the retail level for soft drinks, there is a single dominant firm: Walmart. Walmart, the world's largest company by revenue, operates over 4,700 stores across every U.S. state and are present in nearly every U.S. Metropolitan Statistical Area. Indeed, the vast majority of the U.S. population—90 percent, in Walmart's estimation—lives within ten miles of a Walmart.

33.    Walmart's dominance in the retail market makes it indispensable to its suppliers and gives it significant buyer power in negotiations. This market power is heightened by the significant number of captive customers who shop at Walmart for a complete basket of household goods—only some of which are consumable food and beverage items like soft drinks. In other

words, few retail shoppers who go to Walmart to purchase a large number of goods for their home are likely to leave to buy soft drinks elsewhere. This means that suppliers have significant incentives to keep Walmart happy—as losing Walmart as a customer means losing a substantial number of customers entirely. Indeed, Walmart is the only retailer that is important enough for Pepsi to reference in its annual SEC filings.

34.    In its most recent Form 10-K, Pepsi identified Walmart as its most important customer: "In 2024, sales to Walmart Inc. (Walmart) and its affiliates, including Sam's Club (Sam's), represented approximately 14% of our consolidated net revenue." Indeed, "Walmart is far and away PepsiCo's biggest customer, at least three times larger than the next largest retailers (Kroger, Albertsons, Costco), and bigger than all three combined."[7]

35.    To mitigate against the risk that "the loss of this customer" would pose, Pepsi makes significant concessions to Walmart. Among these are Pepsi and Walmart's joint efforts to maintain a retail "price gap" or "price hedge" between Walmart and its competitors to ensure that Walmart has lower retail prices than its competitors. This "price gap" functions to give Walmart an advantage over its competitors in the retail market for Pepsi soft drinks.

36.    Pepsi's business documents reflect that maintaining Walmart's "price gap"—what Walmart referred to as ensuring retail "price leadership"—is a "foundational commitment," and that "[d]elivering on Walmart hedge commitments is an aligned commercial strategy" across Pepsi. As an internal Pepsi email put it, "stay[ing] focused on our price gap . . . is how we win with Walmart—[w]e stay focused on our deliverables and commitments."

37.    Pepsi keeps close track of Walmart's "price leadership" through regular retail price

---

[7] Errol Schweizer, *How Walmart and Pepsico Rigged Prices and Supercharged Food Inflation*, FORBES (Dec. 18, 2025), https://www.forbes.com/sites/errolschweizer/2025/12/18/how-walmart-and-pepsico-rigged-prices-and-supercharged-food-inflation/.

monitoring. In particular, Pepsi tracks two metrics related to the Walmart retail price gap arrangement: (1) price gap and (2) value hedge. Price gap is the "[c]omparison of average price at Walmart [versus] comparisons within a time frame weighted on Walmart volume for items." By contrast, the "value hedge" metric does not weight by Walmart's volume of items and instead represents a percentage difference in average retail price between Walmart and other retailers. Each metric compares retail prices for Pepsi soft drinks at Walmart with retail prices for the "rest of market" or "ROM." ROM includes "multi outlet" or "multi-channel" stores, and stores in the grocery, club, drug, and dollar channels, but excludes Walmart.

38.    Pepsi similarly tracks and tries to correct for "leakage" of Walmart retail sales to competing retailers due to lower retail pricing at those stores. Pepsi's Vice President of Sales defined "leakage" as the "percentage of consumers that are shifting outside of Walmart to another retailer." A Pepsi evaluation from January 2023 observed that leakage increased when Pepsi failed to maintain Walmart's price gap, writing that the erosion of the "price gap [was] contributing to [a] high degree of conversion [and] leakage" from Walmart to other retailers, and that the "[m]ajority of the leakage and conversion losses [went] to Grocery, Club, [and] Dollar Channels." In the words of Pepsi's VP of Sales, where Walmart is "the least competitive[,] there's the greatest share of market loss."

39.    Walmart likewise monitors its "price gap" on Pepsi soft drinks, and the two communicate frequently about whether Pepsi is meeting Walmart's price gap expectations on a short- and long-term basis. Pepsi endeavors to "manage [retail] price gap expectations to longer timeframes," namely, annual and semi-annual timeframes, but it also views monthly and quarterly retail price gaps as "leading indicators" of potential issues with Walmart. Walmart's buyers (employees responsible for negotiating purchases from manufacturers such as Pepsi) would

receive "Price Gap" reports before planned meetings with Pepsi executives and would discuss how to address specific gaps.

40.    When Pepsi fails to successfully protect Walmart's retail "price leadership," as evidenced on these "Price Gap" reports, Walmart clearly expresses its dissatisfaction and its expectation that Pepsi will take swift action against specific undercutting retailers.

41.    For instance, in 2019, Pepsi became aware that a competing retailer was aggressively cutting retail prices on 12-pack Pepsi soft drinks. Pepsi executives recognized that Walmart would react poorly to these lower prices on the Price Gap report, and that Walmart would demand action. As a Pepsi executive wrote: "[The competitor has] now had multiple weeks of very aggressive pricing and [Walmart senior buyer] will receive a Price Gap report just prior to when [Pepsi executive] is visiting with him about how we move forward on 12pk [twelve-pack cartons of Pepsi soft drinks]."

42.    Likewise, in October 2020, Walmart's senior beverage buyer emailed Pepsi's Senior Director of Sales to complain about a Target promotion featuring discounts on eight packs of Bubly 12-ounce cans. Walmart's buyer expressed frustration that Pepsi "continue[d] to Sales to complain about a Target promotion featuring discounts on eight packs of Bubly 12-ounce cans. Walmart's buyer expressed frustration that Pepsi "continue[d] to undermine [Walmart's] price leadership with our competition." The Pepsi Senior Director responded: "[W]e understand the importance of finishing strong and that price leadership is key. With that context, the data we have indicates [Walmart's] price leadership with [B]ubly is advantaged versus the market and prior year" and that "[Walmart] has an advantaged price gap on [B]ubly v[ersus] [rest of market] and Target."

### C.    Pepsi and Walmart's Agreement

43.    Walmart did not respond to Pepsi's failure to prevent competitive retail pricing—what it referred to as "undermin[ing] [its] price leadership with our competition"—solely with complaints. Instead, it demanded that Pepsi take specific, concrete actions to restore Walmart's price leadership. As one Pepsi executive noted in an email, if Pepsi's monthly or quarterly retail price gaps are "out of balance" with Walmart's expectation, Walmart "will pressure [Pepsi] for actions."

44.    In a competitive market, if Walmart hoped to restore "price leadership" against lower-priced competitors, it would have to cut its retail prices for soft drinks to match those competitors. And if it wanted to do so while maintaining its profit margins, it would have to demand a corresponding wholesale price cut from Pepsi to subsidize its retail price cut.

45.    Instead, Walmart and Pepsi entered into the Scheme: Rather than simply reducing the wholesale and retail prices of soft drinks at Walmart, they agreed to use their combined market power to raise wholesale and retail prices at Walmart's competitors, Wholesale Customers. In particular, Walmart agreed not to cut retail prices (and thus force Pepsi to cut wholesale prices to compensate) if Pepsi targeted competing retailers selling below Walmart's price and took actions to raise their retail prices above Walmart's preferred level. When Pepsi or Walmart saw sustained retail price competition by these retailers—which Pepsi refers to as "offenders"—they agreed that Pepsi would take action to punish these Wholesale Customers for their price cuts in order to restore Walmart's retail price advantage.

46.    In internal communications, Pepsi explicitly stated that it raised competing retail prices to avoid lowering wholesale and retail prices at Walmart. In 2021, Pepsi's Pricing Council—an internal Pepsi organization composed of senior executives and responsible for aligning pricing

strategy—reviewed a "price gap risk" involving grocery chains "battling" for market share by competing on retail price for Pepsi Soft Drinks. As the Pricing Council's talking points emphasized, there was a "decision tree" with two options for addressing the price gap, which Pepsi also called Walmart's "hedge": "1. Raise non-[Walmart] customers through Q1 to prevent price risk" or "2. Manage hedge" by cutting Walmart's wholesale and retail prices.

47.    Where it was "feasible" to do so, Pepsi chose the first option: "moving [the offender's retail pricing] up to correct hedge." One example of Pepsi's efforts to raise competing retail prices pursuant to its agreement with Walmart involved Food Lion, a large regional supermarket chain that operates over 1,000 stores in 10 states. In 2022, Pepsi became aware that Food Lion had "heavily indexe[d]" its retail prices "against retails at [Walmart] and Kroger" and "set[] retails relative to these competitors." For this competitive conduct, Pepsi characterized Food Lion as the "worst offender" violating its price leadership commitment by "beating [Walmart] in price." In response to these lower retail prices, Pepsi designed a multi-year plan to raise Food Lion's retail prices which emphasized that it "must commit to raising rate [on Food Lion] faster than market." This plan included a combination of targeted wholesale price increases—"rais[ing] rate across core [soft drink] packages"—and reductions in promotional payments and allowances—reducing the length of holiday promotions, raising promotion prices, and "scal[ing] back on promoting multiple core packages in the same week"—until Food Lion had no choice but to raise its retail prices to make its sales of Pepsi Soft Drinks profitable.

48.    Pepsi left no doubt that it undertook this effort pursuant to its agreement with Walmart to raise retail prices: Pepsi leadership urged the Food Lion sales team to "CLOSE the gap" on retail pricing because "[w]e absolutely have to demonstrate progress [to Walmart] in the immediate term."

49.    Indeed, for Walmart, there was nothing unusual about its agreement with Pepsi to monitor and inflate competing retail prices, as Walmart uses its dominant market position to induce many of its suppliers to enter similar arrangements.

50.    At the same time that Pepsi agreed to ensure Walmart's "price leadership" by raising Food Lion's retail prices, Energizer Holdings, Inc. ("Energizer")—another large supplier in a highly concentrated industry—made a nearly identical commitment at Walmart's behest.[8] In 2021, Energizer imposed a targeted retail price increase on one of its direct customers selling below Walmart's retail price in order to get the customer to "revise his [retail] pricing and get him off [Walmart's] radar."[9] There, as here, Energizer made crystal clear that its retail-price-maintenance efforts were undertaken pursuant to an agreement with Walmart, writing: "This is 1000% about Walmart and wanting the best price."[10] Energizer's agreement to a nearly identical arrangement with Walmart demonstrates that Pepsi's efforts to raise prices at Food Lion and other discount retailers were not isolated but rather reflective of Walmart's pattern and practice of working with its suppliers to artificially claim "price leadership" without competing on price.

**D.    When Pepsi failed to raise competitors' retail prices, Walmart issued price cuts.**

51.    By raising competitors' retail prices to Walmart's preferred level, Pepsi aimed to restore Walmart's price leadership without requiring Walmart to compete on price. This agreement allowed Walmart to maintain inflated retail prices (because it did not need to match lower-priced competitors) and allowed Pepsi to maintain inflated wholesale prices (because it did not need to lower its wholesale prices to subsidize those lower retail prices in whole or in part).

---

[8] *See* Compl., *Copeland*, No. 5:23-cv-02087, ECF No. 1.

[9] *Id.* ¶ 80.

[10] *Id.* ¶ 83.

52.    Indeed, when Pepsi was unable to successfully "demonstrate progress" on its efforts to raise Wholesale Customers' retail prices above Walmart's level, this wholesale and retail price competition is exactly what occurred, as Walmart forced Pepsi to lower its wholesale prices to fund lower retail prices.

53.    Walmart carried out these wholesale and retail price cuts in part through forced "Rollback" promotions at Walmart stores. Rollback promotions are advertised price reductions at Walmart for specific items, funded in whole or in part by the manufacturer of that item. Sometimes, manufacturers determine it is in their unilateral self-interest to fund Rollback promotions, as heavily advertised price discounts at key times of year (e.g., holidays) can drive sales, increase market share, and improve a manufacturer's profits in the long run.

54.    In internal communications around these Rollbacks, Pepsi executives emphasized that Pepsi undertook these price cuts only begrudgingly: For example, in 2019, immediately before meeting with Walmart's senior buyer regarding a "very aggressive" sub-Walmart retailer on the Price Gap report, a Pepsi executive lamented: "I see no way that we do not start a planned [Walmart] Rollback ASAP to help with combatting the price gap challenge that this [price report] will most definitely create."

55.    Similarly, Pepsi sought to restrict these Rollbacks to only the minimum scope necessary to placate Walmart and to prevent it from taking drastic, nationwide action to reduce retail prices. As a Pepsi employee wrote after agreeing to a regional Rollback on limited products, Pepsi's hope was that these concessions would "[g]et ahead of price gap challenges by showing [Walmart] we are addressing in key spots and avoid [Walmart] forcing national move." And even in agreeing to these temporary Rollbacks, Pepsi emphasized that, in the long run, "sustained progress" was feasible on price gaps only by raising competing retail prices: "the above actions

are intended to improve [Walmart's] gap performance [on our products]; however, to see sustained progress, in some cases, additional [rest of market] actions"—namely, retail price increases—"will be needed."

56.     Forced Rollbacks thus hung as a looming threat over Pepsi and Walmart's relationship: If Pepsi did take action to inflate competing retails to Walmart's preferred price, Walmart agreed to accept Pepsi's preferred wholesale prices; and if Pepsi failed to do so, Walmart would force a wholesale price cut leading to lower wholesale and retail prices for Pepsi Soft Drinks. It was to avoid such widespread wholesale and retail price cuts that Pepsi's leadership urged its Food Lion sales team to raise Food Lion's retail prices: "We absolutely have to demonstrate progress [to Walmart] in the immediate term"—or else sacrifice wholesale prices, and profits, to allow Walmart to match the market.

**E.     Pepsi and Walmart's Scheme inflated wholesale and retail prices.**

57.     Absent the Scheme, Walmart would have had no choice but to match lower retail prices for Pepsi Soft Drinks and demand wholesale price concessions from Pepsi across the board—as it did in limited fashion when it imposed forced Rollbacks—in order to remain competitive in the soft drink market.

58.     These price cuts would have spread across the market, as competing Wholesale Customers would have had little choice but to match Walmart's lower prices and demand lower wholesale prices from Pepsi to remain profitable. Pepsi's only significant competitors—Coca-Cola and Dr. Pepper—would then have been forced to match these lower prices to remain competitive, leading to lower, more competitive pricing on soft drinks across the entire market.

59.     Instead, by eliminating retail price competition, Walmart was able to maintain its preferred retail prices, and Pepsi was likewise able to maintain its preferred wholesale prices,

staving off this price war that would have resulted in lower pricing across soft drinks. With their wholesale and retail positioning secure, Pepsi and Walmart then reaped further benefits of their Scheme by imposing highly profitable wholesale and retail price increases on Pepsi Soft Drinks.

60.    At the wholesale level, Pepsi launched a prolonged series of significant price increases that were made possible by the Defendants' agreement. In 2019, for instance, Pepsi imposed a market-wide wholesale price increase on all its Wholesale Customers—but exempted Walmart, thus fortifying Walmart's "price leadership" position while providing Pepsi further inflated wholesale profits on its remaining sales. As an internal Pepsi email acknowledged: "Our proposal below is not solely focused on the cost increase but is geared toward how we can continue to keep Walmart advantaged through extremely advantaged costs/retails in order to drive growth on our mutual businesses." Indeed, in the same email, Pepsi described a "cost increase, which is already in effect in [the] rest of [the] market," but noted that Pepsi did not pass this increase onto Walmart specifically.

61.    Pepsi followed this up with a series of substantial, successive wholesale price increases on all customers that would not have been possible absent the Scheme. Between 2022 and 2023, Pepsi raised wholesale prices by double-digit percentages each quarter for seven consecutive quarters.[11] In October 2022, commentators observed that these "[p]rice hikes" had "pump[ed] up" Pepsi's profitability, as "PepsiCo's revenues have continuously beaten analysts' expectations quarter after quarter" thanks to its strategy of "pass[ing] on . . . costs to consumers."[12]

---

[11] Dee-Ann Durbin, *PepsiCo Hikes Prices by Double Digits for the 7th Consecutive Quarter and Profits Jump 14%*, DETROIT NEWS (Oct. 10, 2023), https://www.detroitnews.com/story/business/retail/2023/10/10/pepsico-hikes-prices-7th-consecutive-quarter-profits-jump/71127783007.

[12] Maria Monteros, *Price Hikes Pump up PepsiCo's Annual Outlook*, MODERNRETAIL (Oct. 12, 2022), https://www.modernretail.co/operations/price-hikes-pump-up-pepsicos-annual-outlook.

62.    On a 2022 earnings call, Pepsi's Chief Financial Officer, Hugh Johnston, admitted that Pepsi's price increases were protected from competition, stating: "We increased prices at the beginning of the fourth quarter . . . I actually think we're capable of taking whatever pricing [increases] we need."[13] Pepsi's Chief Executive Officer, Ramon Laguarta, echoed this sentiment on a 2023 earnings call, stating: "[O]bviously, we've been able to raise prices and consumers stay within our brand."

63.    At the retail level, Walmart was able to leverage its prevention of retail price competition and softening of wholesale price competition on Pepsi Soft Drinks to not only pass on Pepsi's wholesale price increases to consumers but also independently impose further retail price increases—all of which were protected from competition thanks to the Scheme. This combination resulted in a dramatic retail price increase during the Relevant Time Period, with real prices on soft drinks increasing by over 70 percent between 2019 and 2023:



*Fig. 1: Average Price for Two-Liter Soft Drink*[14]

---

[13] *Id.* (emphasis added).

[14] *Average Price: All Soft Drinks (Cost per 2 Liters/67.6 Ounces) in U.S. City Average*, FED. RSRV. BANK OF ST. LOUIS, https://fred.stlouisfed.org/series/APU0000FN1101 (last updated Jan. 13, 2026, 7:35 AM).

64.    The greatest potential threats to the Scheme were Coca-Cola and, to a lesser extent, Dr. Pepper. They could have attempted to steal market share from Pepsi through lower pricing. But the Scheme reduced their already-limited incentives to do so by facilitating tacit collusion at the wholesale level between these oligopolistic firms.

65.    Together, Coca-Cola, Pepsi, and Dr. Pepper control 93 percent of the carbonated soft drink market. In highly concentrated markets like this, when two dominant firms—here, Coca-Cola and Dr. Pepper—see price increases by another dominant firm—here, Pepsi—they conduct a cost-benefit analysis to determine their course of action. On one hand, Coca-Cola and Dr. Pepper could compete with Pepsi by charging lower wholesale prices—which would presumably be passed on to consumers as lower retail prices—in order to gain market share at the wholesale and retail level. On the other hand, by doing so, Coca-Cola and Dr. Pepper would risk triggering intense price competition that would decrease all three companies' profits (and ultimately benefit consumers). This cost-benefit analysis, particularly when a small number of firms have a history of interacting in the marketplace, can lead firms to engage in what is known as "conscious parallelism" or "tacit coordination"—independently setting their wholesale prices closer to the hypothetical monopoly level, rather than competing, without expressly communicating or colluding.

66.    In fact, Coca-Cola has long emphasized its use of conscious parallelism to set prices, referring to its pricing strategy as "meet-the-competition pricing," pursuant to which Coca-Cola expressly sets its prices "on par with those of other soda brands." By broadcasting its intent not to compete on price with Pepsi, Coca-Cola assures Pepsi that it can profitably impose supracompetitive price increases without worrying that Coca-Cola will undercut it to compete for market share.

67.    These tendencies toward coordinated pricing are further heightened by Pepsi, Coca-Cola, and Dr. Peppers's use of the nationwide network of independent bottlers described above. By using standardized regional facilities to manufacture, bottle, and resell their products, Pepsi and its competitors increase the homogeneity of their supply chains and consolidate pricing decisions in shared actors. Indeed, Pepsi and its competitors often use the same bottlers, at the same time, to reach regional markets, creating myriad opportunities to monitor and coordinate pricing.

68.    Moreover, Pepsi will sometimes use its wholly owned bottling subsidiaries to manufacture and distribute its competitors' products, leading to even more direct opportunities for price coordination. For instance, in 2009, after Pepsi purchased two of the largest independent bottlers for almost $8 billion, it sought to continue to manufacture and distribute Dr. Pepper soft drinks, which the bottlers had previously done pursuant to independent supply agreements. In order to continue distributing Dr. Pepper soft drinks, Pepsi was forced to enter a consent decree with the Federal Trade Commission to remedy the "competitive concern associated with access" by Pepsi to Dr. Pepper's "commercially sensitive confidential information." Despite this consent decree, Pepsi's control over the distribution and sale of its next largest competitor's soft drinks— particularly when combined with Coca-Cola's "meet-the-competition pricing" policy—only further softens the incentives for price competition in the soft drink market and increases the opportunities for price coordination.

69.    Through multiple mechanisms, the Scheme facilitated and enhanced tacit collusion at the wholesale level by increasing Pepsi, Coca-Cola, and Dr. Pepper's incentive and ability to engage in conscious parallelism.

70.    First, by setting Pepsi's retail prices at Walmart's preferred price across the market,

the Scheme made it easier for Coca-Cola and Dr. Pepper to track Pepsi's pricing and react accordingly. Commentators observe that, because retail prices are easier to observe than wholesale prices, oligopolistic manufacturers may use retail-price maintenance agreements to "collude directly on retail prices," and use retail prices to indirectly monitor and facilitate collusion on wholesale prices.15

71.    Second, the Scheme allowed Pepsi, Coca-Cola, and Dr. Pepper to avoid competing on price by opening another avenue of competition: preserving Walmart's margins. By thwarting retail price competition, Pepsi competed for Walmart's business on a non-price dimension— guaranteeing Walmart higher retail margins free from lower competitive pricing—that did not risk a price war among oligopolistic rivals.

72.    Third, by standardizing retail prices on favorable terms to Pepsi's largest buyers, the Scheme prevented these large buyers from leveraging their buyer power to disrupt Pepsi, Coca-Cola, and Dr. Pepper's tacit collusion. As Walmart's forced Rollbacks described above demonstrate, a large purchaser can require its suppliers—even oligopolistic suppliers—to offer discounts and wholesale price cuts to avoid losing the critical customer's business. These forced price cuts have the power to spark a price war by disrupting the pricing equilibrium between

---

15 *See, e.g.*, Bruno Jullien & Patrick Rey, *Resale Price Maintenance and Collusion*, 38 RAND J. OF ECON. 983 (2007) (reviewing the "conventional wisdom according to which vertical restrictions on retail prices help upstream firms to collude" and concluding that "[o]verall, RPM can facilitate collusion and reduce total welfare when firms adopt it"); *see also* David Gilo & Yaron Yehezkel, *Vertical Collusion*, 51 RAND J. OF ECON. 133 (2020) ("We characterize collusion involving secret vertical contracts between retailers and their supplier . . . ('vertical collusion'). We show such collusion is easier to sustain than collusion among retailers. Furthermore, vertical collusion can solve the supplier's inability to commit to charging the monopoly wholesale price when retailers are differentiated."); Emanuel Holler & Dennis Rickert, *How Resale Price Maintenance and Loss Leading affect Upstream Cartel Stability: Anatomy of a Coffee Cartel*, 85 INT'L J. OF INDUS. ORG. (2022) ("[R]esale price maintenance facilitated better organization of the cartel, as evidenced by the higher overcharges and longer cartel duration.").

oligopolists and spurring competitors to respond in kind. By agreeing to shut down retail price competition, Pepsi averted Walmart's threatened Rollbacks and protected Pepsi, Coca-Cola, and Dr. Pepper's abilities to price oligopolistically.

73.    The Scheme's effectiveness in softening inter-brand competition is demonstrated by Figure 1, above, which demonstrates the real prices on all soft drinks increasing by over 70 percent during the Relevant Time Period. If Coca-Cola and Dr. Pepper had responded to Pepsi's inflated prices by competing on price at the wholesale level, one would have expected that price competition to prevent market-wide price inflation, while leading to a decline in Pepsi's market share. Instead, the opposite occurred: Prices increased on soft drinks across the board, whether sold by Pepsi, Coca-Cola, or Dr. Pepper. These increases can be explained only by success of the Scheme.

74.    Pepsi's wholesale price increases cannot be explained by increased demand for soft drinks. On the contrary, per-capita soft drink consumption has exhibited what market analysts describe as a "long-term trend of gradual decline," decreasing by over 15 percent since its early-2000s peak and by more than a gallon per consumer annually during the Relevant Time Period. Despite this decreasing demand, Pepsi was able to raise its prices by double-digits each quarter and see its "profits jump" by double-digits in doing so.

75.    Nor can Pepsi's wholesale price increases be explained by increased costs or general inflation. Commentators noted that Pepsi had "continually beaten analysis' expectations" by successfully increasing prices by more than costs during the pandemic.

76.    Further, while inflation was only 3.2 percent in July 2023 and October 2023, Pepsi increased prices by 15 percent and 11 percent in each month.

77.    A December 2025 industry report used Consumer Price Index data to demonstrate

that these prices increases are at odds with competitive market forces: "[P]rices for 2-liter soda bottles have risen at more than double the rate of inflation since 2020, going up by 62% at a time when the national inflation rate was 25%. The cost increases are even more drastic for 12-pack boxes of soda cans. From 2020 to 2025, the average price for 12-packs nearly doubled, rising by 89% overall, which is more than triple the rate of inflation during that time."[16] The report included the following graph demonstrating the pricing differential above inflation.



*Fig. 2: Soda Cost Increases, 2020-2025*[17]

78.    Indeed, consumers at every level are feeling the price increases caused by the Scheme. Since 2019, "[i]n PepsiCo's core categories, prices have gone up even more, including

---

[16] *Soda Inflation: Prices Have Bubbled Up Faster Than Inflation Since 2020*, FINANCEBUZZ, https://financebuzz.com/soda-inflation (updated Jan. 23, 2026).

[17] *Id.*

soft drinks (67%)," yet "sales growth has been astronomical, including soft drinks, up 76%."[18] In an interview, one independent grocery retailer noted "Pepsi twelve-packs, for instance. My cost is $9, and Walmart's retail is $7.97."[19]

## V.    MARKET POWER AND RELEVANT MARKET

79.    The relevant product market consists of the market for bottled soft drinks. There are no reasonable substitutes for bottled soft drinks. Customers purchasing bottled soft drinks at retail do not view bottled soft drinks as reasonably interchangeable with other types of beverages, such as alcoholic drinks or non-bottled soft drinks. Alcoholic drinks have obvious mood-altering effects that render them non-substitutable, while non-bottled beverages, such as fountain drinks, usually cannot be purchased at the same retail locations (e.g., supermarkets and convenience stores) as bottled drinks, and cannot be transported and stored for extended periods without spoiling. Nor are soft drinks substitutes for any non-beverage products for virtually any purpose.

80.    The relevant geographic market consists of the United States, and its territories, possessions, and the Commonwealth of Puerto Rico (in conjunction with the relevant product market above, the "Relevant Market").

81.    A hypothetical monopolist in the market for bottled soft drinks could profitably impose a small but significant non-transitory increase in price without causing a significant number of customers to switch to other products. The fact that Defendants were able to profitably inflate the prices of Pepsi Soft Drinks shows that there are no sufficiently reasonable substitutes, and therefore that soft drinks are a relevant market.

---

[18] Errol Schweizer, *How Walmart and Pepsico Rigged Prices and Supercharged Food Inflation*, FORBES (Dec. 18, 2025), https://www.forbes.com/sites/errolschweizer/2025/12/18/how-walmart-and-pepsico-rigged-prices-and-supercharged-food-inflation/.

[19] MORE PERFECT UNION, *We Uncovered the Scheme Keeping Grocery Prices High*, at 1:48 (YouTube, Feb. 10, 2026), https://www.youtube.com/watch?v=odhVF_xLIQA

82.     Pepsi has significant market power within the Relevant Market. It is the second largest manufacturer of carbonated soft drinks in the United States, controlling roughly a third of the market; along with the largest (Coca-Cola) and third largest (Dr. Pepper), the three account for over 90 percent of carbonated soft drink sales in the United States. There are significant barriers to entry in the bottled soft drink market, due to the incumbent firms' multi-billion-dollar investments in advertising and brand recognition as well as economies of scale through well-established distribution networks.

83.     Walmart has significant market power within the Relevant Market. Walmart is the world's largest company by revenue and operates over 4,700 stores across every U.S. state and within nearly every U.S. Metropolitan Statistical Area. Roughly 90 percent of the U.S. population lives within ten miles of a Walmart. Walmart's dominance in the retail market makes it indispensable to its suppliers and gives it significant buyer power in negotiations. Conversely, losing Walmart as a customer means losing a substantial number of retail customers entirely.

84.     Direct evidence establishes Defendants' combined market power in the Relevant Market. That direct evidence includes Defendants' ability to profitably and sustainably inflate prices above competitive levels. It also includes Pepsi's large price increases since January 2019 that were enabled by its agreement with Walmart that cannot be explained based on competitive forces.

85.     As shown by Pepsi's significant price inflation alleged herein, inter-brand competition did not restrain Pepsi from inflating its prices. On the contrary, Pepsi's agreement with Walmart reduced price competition between Pepsi, Coca-Cola, and Dr. Pepper by encouraging Coca-Cola and Dr. Pepper to follow Pepsi's price increases and by reducing any incentives for Coca-Cola and Dr. Pepper to attempt to compete with Pepsi on wholesale pricing.

86.    Walmart's agreement with Pepsi made it easier for Coca-Cola and Dr. Pepper to observe and follow Pepsi's price changes and prevented Walmart from instigating a price war by forcing Pepsi to compete aggressively with Coca-Cola and Dr. Pepper on price.

## VI.    ANTICOMPETITIVE EFFECTS

87.    The Scheme caused Walmart's competitors—Wholesale Customers—including Plaintiffs and members of the proposed Class, to pay inflated wholesale prices for Pepsi Soft Drinks, impairing their ability to compete effectively with Walmart in the retail market.

88.    Pursuant to the Scheme, Pepsi increased Wholesale Customers' costs to acquire Pepsi Soft Drinks through increased wholesale prices and reduced promotion payments.

89.    As a result, the Scheme foreclosed Walmart's competitors, including Plaintiffs and members of the proposed Class, from gaining market share by offering lower prices than what Walmart could offer.

90.    The Scheme enabled Pepsi to implement anticompetitive wholesale price increases that cannot be attributed to general or competitive market conditions.

## VII.    STATUTES OF LIMITATION DO NOT BAR PLAINTIFFS' CLAIM

### A.    Continuing Violation

91.    During the Relevant Time Period, Defendants' Scheme was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by taking overt acts in furtherance of the Scheme.

92.    Throughout the Relevant Time Period, Defendants discussed the Scheme, adjusted it to match new Walmart prices, agreed to new wholesale price increases, and repeatedly enforced their agreement against retailers who attempted to undercut Walmart's retail prices for Pepsi Soft Drinks.

93.     Throughout the Relevant Time Period, Defendants' Scheme repeatedly injured Plaintiffs and proposed Class Members by causing them to pay overcharges each time they directly purchased Pepsi Soft Drinks from Pepsi.

**B.      Fraudulent Concealment**

94.     The statute of limitations is tolled because Defendants fraudulently concealed their Scheme.

95.     Defendants have denied and continue to conceal the above allegations. In a January 2025 press statement, Pepsi stated, "PepsiCo's practices are in line with industry norms and we do not favor certain customers by offering discounts or promotional support to some customers and not others."

96.     In a May 25, 2025 letter responding to an official Congressional inquiry into the Scheme, Pepsi denied any wrongdoing and averred, "Retail pricing may reflect and include wholesale costs, but is also influenced by a range of other considerations such as category dynamics, competitor pricing, consumer shopping occasion, retailer margin requirements, retailer performance, and individual retailer revenue management strategies. PepsiCo does not control retail pricing." Pepsi further stated, "PepsiCo's pricing architecture is designed to ensure that all retailers—regardless of size or channel—receive competitive, non-discriminatory pricing, discounts, and promotional support."

97.     In a December 2025 press statement, Pepsi stated: "PepsiCo continues to operate in compliance with applicable laws and remains committed to providing all customers with fair, competitive, and non-discriminatory pricing, discounts and promotional value, regardless of size or channel."

98.     Walmart consistently maintains publicly that "it is committed to negotiating on

behalf of its customers so it can deliver value and everyday low prices."[20]

99.    Plaintiffs and members of the proposed Class did not have actual or constructive knowledge of the facts constituting their claim for relief and did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy.

## VIII.    CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as representatives of the proposed Class, which is defined as follows:

> All persons or entities that directly purchased Pepsi Soft Drinks from Defendant Pepsi within the United States from January 1, 2018, through the present and until the unlawful conduct alleged herein ceases.

101.    Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of their immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

102.    The proposed Class is so numerous that joinder of all members in this action is impracticable. On information and belief, there are hundreds, if not thousands, of members in the proposed Class.

103.    Plaintiffs' claims are typical of those of the proposed Class because Plaintiffs press the same legal theories, and seek to redress the same injury, for themselves as for all members of

---

[20] Kate Perez, *Lawsuit against Walmart, PepsiCo alleges decade-long price fixing scheme*, USA TODAY (Jan. 8, 2026), https://www.usatoday.com/story/money/2026/01/08/walmart-pepsi-price-fixing-scheme-lawsuit/88083796007/

the proposed Class.

104.    Plaintiffs and all members of the proposed Class were injured by the same unlawful conduct, which resulted in all of them paying higher prices for Pepsi Soft Drinks than they otherwise would have in a competitive market.

105.    Plaintiffs will fairly and adequately protect and represent the interests of the proposed Class. Plaintiffs' interests are not antagonistic to the proposed Class.

106.    Questions of law and fact common to the members of the proposed Class predominate over questions, if any, that may affect only individual members.

107.    Questions of law and fact common to the proposed Class include, but are not limited to, the following:

      a.     Whether Defendants entered into the Scheme;

      b.     The nature, scope, and extent of the Scheme;

      c.     Whether, if Defendants entered into such a contract, combination, conspiracy, or common understanding, that conduct is a *per se* violation of Section 1 of the Sherman Act;

      d.     Whether the Scheme, in the alternative, is unlawful under the rule of reason;

      e.     Whether Defendants' conduct has resulted in artificially raised prices of Pepsi Soft Drinks purchased by members of the proposed Class; and

      f.     The proper measure of damages for the proposed Class.

108.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

109.    Class action treatment is the superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of

similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

IX.     CAUSES OF ACTION

<u>COUNT ONE</u>
**VIOLATION OF SECTION ONE THE SHERMAN ACT**
**(15 U.S.C. § 1)**

110.    Plaintiffs incorporate by reference each above allegation as if fully set forth herein.

111.    Defendants violated and continue to violate 15 U.S.C. § 1 by entering, furthering, and enforcing an unreasonable restraint of trade. Specifically, Pepsi and Walmart agreed to fix, increase, inflate, or stabilize wholesale prices of Pepsi Soft Drinks.

112.    Due to Defendants' conduct in violation of Section 1 of the Sherman Act, Plaintiffs seek monetary relief on behalf of itself and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15, 26).

113.    Beginning in or around 2018, Defendants entered and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

114.    Defendants' conduct was undertaken with the intent, purpose, and effect of artificially increasing prices for Pepsi Soft Drinks above competitive levels.

115.    Defendants perpetrated this Scheme with the specific intent of increasing prices for Defendants' own benefit.

116.    The agreement reached by Defendants stifles intra-brand competition by eliminating price competition from other retailers that compete with Walmart in the retail market.

117.    The agreement reached by Defendants also reduces inter-brand competition between Pepsi, Coca-Cola, and Dr. Pepper.

118.    The relevant market is the market for soft drinks. Pepsi has market power in the relevant market, controlling about one-third of the bottled soft drink market. This market power is enhanced by the concentrated nature of the soft-drink industry, with just three manufacturers accounting for the vast bulk of sales. There are significant barriers to entry into the bottled soft drink market due to the existing manufacturers' multibillion dollar investments into durable advantages in brand recognition and relationships with bottlers, without which competitors cannot reach the mass retail market.

119.    Pepsi's market power was enhanced by the Scheme due to the anticompetitive agreement being with Walmart.

120.    Walmart has market power in the brick-and-mortar retail market. Walmart is the largest retailer in the United States and the dominant retailer in many relevant geographic markets.

121.    Walmart used its market power to cause Pepsi to agree to limit price competition from Wholesale Customers—Pepsi's other direct purchasers.

122.    Defendants' Scheme had substantial price effects on the market for soft drinks generally, and therefore on Pepsi Soft Drinks. Defendants' agreement increased the wholesale price of Pepsi Soft Drinks substantially. The agreement also stifled competition that should exist between direct purchasers, leading directly to higher retail prices for Pepsi Soft Drinks.

123.    There is no pro-competitive justification for the Scheme. For example, Pepsi Soft Drinks are not specialized products that require retailers to expend resources to explain their use to consumers or maintain a skilled sales staff that is familiar with their products.

124.    The Scheme violates the rule of reason under a "quick look" analysis because its anticompetitive effects are plain and obvious.

125.    Further, the Scheme violates the complete rule of reason analysis because the agreement harms competition without providing any benefit to any relevant market.

126.    As a result of Defendants' Scheme, prices for Pepsi Soft Drinks were inflated above competitive levels in the United States.

127.    Defendants' actions have caused Plaintiffs and the proposed Class to suffer damages in the form of paying supracompetitive prices for Pepsi Soft Drinks.

128.    As a direct and proximate result of Defendants' unlawful Scheme, Plaintiffs and the members of the proposed Class have suffered injury to their business or property. Plaintiffs and the proposed Class will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

129.    Plaintiffs and the proposed Class are entitled to recover three times the damages sustained by them, interest on those damages, and reasonable attorneys' fees and costs under Section 4 of the Clayton Act (15 U.S.C. § 15).

130.    Plaintiffs and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein under Section 16 of the Clayton Act (15 U.S.C. § 26), as well as any other just and equitable relief the Court deems proper.

## X.    PETITION FOR RELIEF

Plaintiffs petition for the following relief on their own behalf and on behalf of the Class

defined herein:

A.  A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

B.  A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act;

C.  A judgment and order requiring the Defendants to pay treble damages to Plaintiffs and members of the proposed Class;

D.  An order enjoining the Defendants from engaging in further unlawful conduct;

E.  An award of attorneys' fees and costs;

F.  An award of pre- and post-judgment interest on all amounts awarded; and

G.  Such other and further relief as the Court deems just and equitable.

## XI.  JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated: February 16, 2026                    Respectfully submitted,

                                            */s/ Kevin Landau*
                                            Kevin Landau
                                            Miles Greaves
                                            **TAUS, CEBULASH & LANDAU, LLP**
                                            123 William Street, Suite 1900A
                                            New York, New York 10038
                                            Telephone: 646-873-7654
                                            Facsimile: 212-931-0703
                                            Email: klandau@tcllaw.com
                                            Email: mgreaves@tcllaw.com

                                            Daniel E. Gustafson (*pro hac vice* forthcoming)
                                            Michelle J. Looby (*pro hac vice* forthcoming)
                                            Joshua J. Rissman (*pro hac vice* forthcoming)
                                            Bailey Twyman-Metzger (*pro hac vice* forthcoming)

34

Joe E. Nelson (*pro hac vice* forthcoming)
Adam J. Kolb (*pro hac vice* forthcoming)
**GUSTAFSON GLUEK LLP**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
Jrissman@gustafsongluek.com
btwymanmetzger@gustafsongluek.com
jnelson@gustafsongluek.com
akolb@gustafsongluek.com

*Counsel for Plaintiffs and the Proposed Class*